2023 IL App (1st) 092393-U

Nos. 1-09-2393, 1-21-1177 (cons.)

Second Division
January 31, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | No. 85 C 003021 |
| v. | ) ) | |
| KEITH HODDENBACH, | ) ) | Honorable James B. Linn |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred.

**ORDER**

¶ 1    *Held*:  The postconviction court's order denying defendant a new trial after a third-stage evidentiary hearing is affirmed where defendant failed to meet his burden on his actual innocence and ineffective assistance of counsel claims.

¶ 2    Following a 1986 jury trial, defendant-appellant, Keith Hoddenbach, was convicted of one count of first-degree murder, one count of attempt murder, and one count of aggravated battery. Defendant was subsequently sentenced to a total of 110 years in prison. Since his conviction,

defendant filed a direct appeal and various petitions for postconviction relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/121-1 *et. seq.* Before us today are two separately filed but interrelated appeals, appeal numbers 1-09-2393 (*Hoddenbach III*) and 1-21-1177 (*Hoddenbach V*).

¶ 3    *Hoddenbach III* concerns whether, following remand by our supreme court to ensure compliance with Illinois Supreme Court Rule 651(c), the postconviction court erred in denying postconviction counsel leave to amend defendant's petition with actual innocence claims during second stage proceedings. *Hoddenbach V* concerns the adjudication of those same actual innocence claims, as well as ineffective assistance of trial counsel, following the petition's advancement to a third-stage hearing, where the postconviction court denied the entirety of the claims and request for a new trial. Defendant appeals both of those dismissals, and for the following reasons, we affirm.

¶ 4                                I. BACKGROUND

¶ 5    Because our decision in *Hoddenbach V* ultimately rests on the evidence presented at defendant's underlying trial and his postconviction evidentiary hearing, a thorough review of the record is necessary.

¶ 6                         A. Underlying Trial Proceedings

¶ 7    On December 11, 1984, between 7:30 and 8:00 p.m., 15-year-old Santos Martinez was shot and killed at a Vienna Hot Dog Stand on California Avenue and Cortland Street. Richard Figueroa and Roberto "Keke"[1] Rivera were also shot and wounded in the same incident. On December 19, 1984, defendant, also known as "Popeye," was arrested at his residence in connection with the

---

[1] Roberto Rivera's alias is spelled at least two different ways throughout the record.

shooting. Co-defendant, Rafael "Duce" Maldonado, was also arrested in connection with the same incident. Defendant was charged with two counts of murder, two counts of attempted murder, six counts of aggravated battery, three counts of armed violence, and one count of conspiracy.

¶ 8     Defendant and Maldonado's trials were severed. Prior to trial, defendant filed a motion to quash and suppress his arrest. The trial court denied defendant's motion, and the case proceeded to trial, where the following evidence was adduced.[2]

¶ 9                         1. Officer William O'Connor

¶ 10    Officer O'Connor testified he was employed with the Chicago Police Department (CPD) and was currently assigned to the crime scene processing section of the department's crime lab. His duties included responding to a crime scene, photographing it, and gathering any physical evidence for further analysis.

¶ 11    On December 11, 1984, he responded to a homicide at a hot dog stand on California and Cortland around 8 p.m. with his partner, Officer Thomas Reynolds. There were three shooting victims. He searched inside the restaurant and located a fired shotgun shell from outside the front door in the parking lot of the restaurant, as well as three inside the restaurant. There were also bullet holes in the ice machine, and on a wall underneath a public telephone in the rear of the store.

¶ 12                        2. Richard Figueroa

¶ 13    Figueroa testified that he was 13 years old and was in the hot dog stand at California and Cortland with friends at about 7:30 p.m. on December 11, 1984. When he arrived, he went to the counter, ordered food, ate, and then went to play video games. From where the video games were

---

[2] The prosecution called multiple witnesses. We recite the testimony of the most relevant witnesses herein in relation to defendant's postconviction petition in *Hoddenbach V*. We recite their testimony in chronological order.

located, Figueroa could see the front door of the restaurant. The lighting conditions in the restaurant were brightly lit. He did not play the video games, and instead watched his friend Keke play, who he had met the day before. There were about six or seven other people there, including Dwight Littleton, Jesse Lanzarin, and Martinez. Figueroa knew Keke was a member of a gang, the Disciples.

¶ 14    At some point, Lanzarin told Keke that someone was pointing a gun at Keke's head. Figueroa looked back at the door, saw no one there, and turned back to the video games. Someone said, "he is back," and Figueroa looked back at the front door. He saw a man standing two feet from the front door inside the restaurant, wearing gloves and holding a black pump shotgun in his hands slightly above his waist. He was wearing black pants, a black jacket that came to his thighs, and a black ski hat that came down slightly above his eyebrows. The man also wore a gray scarf on his face, which covered his body up until his chin. Nevertheless, Figueroa could see the shooter's eyes, lips, cheeks, part of his face underneath his nose, a black mustache, and mouth. Figueroa described him as a husky "dark-skinned Hispanic," about 19 or 20 years old, standing at five foot six or five foot seven inches. Figueroa identified defendant in court as the shooter, as well as through a photo array, as the individual holding the shotgun.

¶ 15    Figueroa testified that during the encounter, he was watching Defendant's face and the gun, and that defendant was "looking from side to side." Defendant pointed at the counter, pumped the shotgun, and fired while Figueroa remained in the same position. After the first shot, defendant pointed the gun towards the pay telephone where Martinez was standing. Figueroa testified that defendant shot Martinez, who then fell to the ground.

¶ 16    After the second shot, Figueroa tried to run behind the video games. However, defendant shot two more times, and Figueroa was hit on his left leg. Keke was also shot on his buttock.

Figueroa was able to make it behind the video games and then did not hear anymore gunshots. He could not see the front door anymore but could hear people screaming. When he came back out from behind the video games, defendant was gone. Figueroa saw Martinez lying down on the ground close to the payphone.

¶ 17    Figueroa was taken to St. Mary's Hospital by ambulance. He talked to plain-clothed police detectives at the hospital and provided a description of the shooter to them.

¶ 18    On October 2, 1985, at 11 a.m., Figueroa went to the police station to view a lineup. There, he identified defendant in the lineup as the person who shot him and Martinez. Figueroa then identified defendant in court again as the person he identified in the lineup. He testified that police did not tell him who to identify, nor did anyone else who had been a witness to the shooting.

¶ 19    On cross-examination, Figueroa testified that the shooter had been about 15 to 20 feet away from him. He denied telling police officers that the shooter had been wearing a ski mask and clarified that it was a black ski hat that came down to his eyebrows. The gray scarf had been under his chin, not over the shooter's face, and perhaps tucked into his jacket. He did not tell police that the gray scarf came up to the shooter's eyes. He stated that he had described the shooter as "husky," not "chunky." He was not able to see any of the shooter's hair, ears, or the sides of his face.

¶ 20    After the second shot, Figueroa tried to run, but ended up falling because a chair fallen on him. He tried to run in a direction away from the door, and his back was to the door and the shooter. Thus, the gunshot struck him in the back of the leg. He believed it was a couple of seconds between the first and second gunshots. Figueroa reconfirmed that defendant was the individual he identified in the lineup, and that he had never seen him before he identified him.

¶ 21                                           3. Dante Carranza

¶ 22    Carranza testified that he was 18 years old and that he had been present at the hot dog stand in the back of the restaurant. He had been watching his friends play video games but was standing up and could see the front door from his position. At some point, he heard someone say, "somebody is at the door with a gun," looked at the door, and saw a person with a gun standing there.[3] Carranza further testified that he viewed a lineup and "picked the guy who shot his friends." Carranza identified defendant in court, as well as through pictures of the lineup.

¶ 23    On cross-examination, Carranza testified that the shooting was the first time he had ever seen defendant. Carranza believed the shooter was five foot five inches. He did not know what material the shooter's black hat was made of but knew that it came down to the shooter's eyebrows and right above his ears. The scarf also covered his ears, but Carranza could see his cheeks, chin, and nose.

¶ 24    He did not remember how many days passed from when the shooting occurred to when he talked to the police next. He knew that they had come to his school, but only remembered one of the cops' names as "Bob." Bob did not ask for a description of the shooter and did not show him photos. However, Carranza told the police officer that he could identify the shooter. Subsequently, the police brought him to the station to view a lineup. Carranza had not been the station since the lineup and did not remember talking to a state's attorney during a lineup.

¶ 25                                4. Cordova

_____

[3] The State points out that a substantial portion of Carranza's testimony is missing from the record. Our review of the record confirms this. As correctly noted by the State, it is the appellant's burden "to present a record which fairly and fully presents all matters necessary and material for the decision of the questions raised." *Interstate Printing Co. v. Callahan*, 18 Ill. App. 3d 930, 932 (1974). We resolve any doubts resulting from the incompleteness of the record against defendant. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391 (1984).

¶ 26 George Cordova testified that he was 15 years old. On December 11, 1984, he was in the hot dog stand eating with his friend, Figueroa. He left the restaurant around 8 p.m. and went to a store across the street, where he met his cousin. The two then walked to their other cousin's car, which was parked on Cortland. He sat in the front seat and could still see the restaurant from where the car was parked.

¶ 27 Cordova testified that a light blue Monte Carlo car pulled into the alley behind the hot dog stand and stopped with the driver's side closest to Cordova. He observed someone emerge from the passenger seat while the car was still running. The individual wore black clothes, a black jacket, and a scarf which was hanging from his shoulders. He did not see a hat, but he noticed that there was "something in his hands that was long." Cordova observed another person in the car but could not identify the individual.

¶ 28 Cordova observed the first individual walk up to the front doors of the restaurant, open the door, and point a gun. The individual then left the restaurant and walked to one side of it. Cordova could not tell what he was doing but observed that "he was doing something to whatever was in his hands." Cordova watched the individual walk back into the restaurant, open the door, and point a gun. Cordova heard "loud noises," and then saw individual leave the restaurant and run back out to the parked car in the alley. The individual got back into the passenger seat, and the car drove off quickly.

¶ 29 On cross-examination, Cordova testified that he was in the car for about 30 minutes talking to his cousin, that there were two girls in the backseat, and he did not have anything to drink or smoke. He estimated his cousin's car to be about 50 feet from the restaurant. He had never seen the blue Monte Carlo before. He believed the two cars to be about 75 feet apart, and nothing had been obstructing his view. When the Monte Carlo first arrived, he continued to talk to the others

in the car and was not paying attention to it. He could not see the individual's face. He did not know "how big" the person was who got out of the car. He could not be sure that the individual had a gun, but he was "not too far away" to determine that it was and he "figured he had [one]." He could not see the color of the gun, and he did not see the license plate number of the Monte Carlo as the back of the car was facing the other way.

¶ 30                                5. Dwight Littleton

¶ 31    Littleton testified that he was 14 years old and that on 7:30 p.m. on December 11, 1984, he was in the hot dog stand. Littleton was seated on a stool and watching others play video games, which were about 20 feet from the front door of the restaurant. The lighting was bright, and he could see the door.

¶ 32    Littleton overheard Lanzarin say that a man had come into the restaurant and pointed a gun at Keke. When Littleton looked towards the door, no one was there. He turned back towards the game and then someone said, "here he comes again." Littleton turned back to the door and saw a man wearing gloves, a black jacket, a black skull knit cap that came down to his eyebrows, and a gray scarf that covered his chin and ears. He was also holding a black pump shotgun at his waist. He could see that shooter's right eye was "cross-eyed." He could also see the shooter's mouth, nose, half of his cheeks, and black moustache. He was 20 to 21 years old, was about five foot six or seven inches, and was chubby, between 150 to 160 pounds. Littleton identified defendant in court as the individual in the restaurant.

¶ 33    Littleton could see defendant's face "the whole time," and observed defendant point a gun at the counter, pump and fire. Defendant then turned, pointed the gun, pumped and fired a second shot towards the payphone. Littleton saw Martinez hit by the second shot and fall. After the second

shot, Littleton dived to the counter and fell in front of the games behind the stools. He could still see defendant's face and the gun from behind the stool.

¶ 34    Defendant then fired a third shot towards the games where Richard, Jesse, and Keke stood. The three began to run towards the back of the games. Littleton could still see defendant's face and the gun. He observed defendant turn, pump the gun, and fire more shots towards the video games. Littleton could still see defendant's face and the gun after the fourth shot. Defendant then looked around and left. After defendant left, Littleton saw Martinez lying face down by the telephone.

¶ 35    Littleton went to the police station that night in a police car. He gave a statement at the station and was in a room with officers with no other witnesses. On December 19, 1984, Littleton viewed a lineup at the station, where he identified defendant as the shooter. Littleton then identified defendant in court as the individual he selected at the lineup. He was also shown a photo array of who he picked out in the lineup, and again picked out defendant.

¶ 36    On cross-examination, Littleton testified that he had never seen the shooter before. He did not remember the names of the detectives he spoke with. His description to the police had been that the shooter was short, about five foot five or six, but he did not remember telling the police that the shooter was about 140 pounds. He stated that he gave a physical description to the police beyond height and weight. He denied telling the police that he had only concentrated on the gun during the shooting and said that he had been "concentrating on both the man and the gun." He also told the police about the shooter's right eye and that it was "kind of crooked." Littleton testified that he believed he spoke to the police again on June 6, 1984, where he viewed more photos and answered more questions.

¶ 37                                    6. Officer John Howe

¶ 38    Officer Howe was a gang crimes specialist and detective in CPD. On December 11, 1984, at 11:30 p.m., he and his partner began investigating a homicide. The suspect's description was a white Hispanic male, 17 to 18 years old, five foot four to five foot seven inches, between 140 and 160 pounds, a moustache and was wearing dark clothing, a knit dark hat, and a gray scarf. They did not locate anyone that night.

¶ 39    On December 19, 1984, Howe located defendant at a second-floor apartment at 2250 West Melrose at 11 a.m. and placed him under arrest. Defendant asked for the police to retrieve a jacket from his bedroom. Howe went to locate it and saw a short black shotgun propped up against an open closet door, as well as a shotgun shell. Howe took custody of both for processing. Howe and other officers took defendant downstairs and asked him if he wanted the police to drive his car to the police station, as it would otherwise be towed. Defendant agreed and turned over his keys.

¶ 40    On December 19, 1984, Howe was present for a lineup. The lineup consisted of five people, including defendant. The lineup was viewed by Littleton and Lanzarin, who both viewed defendant separately and identified him as the shooter.

¶ 41    On cross-examination, Howe testified that he had been given a composite description of the shooter after the incident, but that the description did not include any description about the offender's right crossed eye. Defense counsel asked Howe if, hypothetically, when interviewing a witness who told him that the offender had a right crossed eye, whether such a description would have been noted in the description or report. Howe agreed it would have been. Howe testified that the lead detective had not mentioned that the offender had a right crossed eye, and that none of the police reports reflecting the incident contained any such mention. Howe testified that the recovered shotgun and shell in the bedroom had been in "plain view," which had been located in the bedroom that defendant had directed him to. He had never seen the shotgun before.

¶ 42                                    7. Jesse Lanzarin

¶ 43    Lanzarin testified that he was 14 years old and currently housed at the juvenile division of the Illinois Department of Corrections for attempt criminal sexual assault. On December 11, 1984, he had been living in Chicago and was in school. At 7:30 p.m., he left his home with his brother to go to the hot dog stand. The brothers went to the back of the restaurant, and his friends were there. Littleton watched them play video games and stood about 20 feet away from the front door of the restaurant, which he could see from his position.

¶ 44    Lanzarin saw someone come through the front doors. Lanzarin described him as a white man, dressed in black, with a ski hat on his head, black gloves, and a gray scarf that covered him his ears to his chin. Lanzarin saw a gun in his hand. The man held the front door open with his foot. Lanzarin observed him point the gun at Keke, who was standing on Lanzarin's right side. Lanzarin then identified defendant in court as the man who pointed the gun.

¶ 45    The man cocked the gun, but nothing happened. Lanzarin observed the man step back outside but did not see where he went. Lanzarin went over to Keke and told him that someone had cocked a gun at him. Both he and Keke looked at the door, and the man came back inside the restaurant, dressed the same way with the same gun in his hands. Lanzarin could see his face from his position in the restaurant.

¶ 46    Lanzarin testified that the man then pointed the gun at the telephone where Martinez was standing, cocked it, and shot it. After the second shot, the man looked to opposite side of the restaurant where the others were standing. Lanzarin was still able to see his face but began to run to the back of the machines, while Keke stood there. After the last two shots, Lanzarin emerged from behind the machines and looked towards the doors. He did not see anyone standing there

anymore. He looked at Keke, who was lying on the floor bleeding. Figueroa and Martinez were also bleeding.

¶ 47    Lanzarin testified that the police arrived, and that he went with them to the police station that night. He talked to officers there, and then went home. On December 19, 1984, the police took him back to the station, where he viewed a lineup and identified defendant. Lanzarin also identified defendant in court as the individual he picked out in the lineup. He was not told to pick anyone out of the lineup.

¶ 48    On cross-examination, when asked what description he gave to officers, Lanzarin testified that he did not tell them that the shooter was wearing a black hat with a gray scarf. However, he also stated that he told them the gray scarf did not cover the shooter's face and came down to the middle of the shooter's chin. He described the hat as a ski mask which came down to his forehead, above his eyebrows, and that he could see the shooter's nose, eyes, mouth, and moustache. He testified that he told them the shooter was between 18 to 20 years old, that the shooter was "chubby," and he did not see any other facial hair. When asked if he had noticed anything unusual about the shooter's eyes, he said that he told police that "one of his eyes was hanging low," but did not tell them which eye it was. Lanzarin testified that about 30 seconds passed between the initial gunshot and the last. His back had been to the shooter when he ran behind the machines. Lanzarin described to the police that the gun used was "long," with some "type of handle coming out of the middle of it."

¶ 49    As to the lineup, Lanzarin stated that no prosecutors were present, and that two officers were present with him when he made the identification of defendant. Police did not discuss

anything with him before he viewed the lineup, and they did not tell him that they had the shooter in custody.[4]

¶ 50                                         8. Richard Chernow

¶ 51     Chernow testified that he was a police officer with CPD and his current assignment was in the department's crime lab as a firearms technician, and his qualifications were stipulated to by both parties. The purpose of his job was to determine whether certain bullets, cartridges, or shotgun shells had been fired from a specific firearm to the exclusion of others. Chenow analyzed four shotgun shells recovered from the hot dog stand, and found that they were all fired from the same shotgun. In his opinion, the four shells had been fired from the pump shotgun recovered from defendant's residence, to the exclusion of other firearms.[5]

¶ 52                                         9. Robert "Keke" Rivera[6]

¶ 53     Rivera was called by the defense. He testified that on December 11, 1984, he went to the hot dog stand around 7 p.m. While walking to the restaurant, he saw a blue Chevy Malibu or Cutlass. The occupants of the car made a "type of sign language" at him and he made one back.

---

[4] Other witnesses for the State were CPD Sergeant Russel Weingart and CPD Officer Anthony Bongiorno regarding the description of the shooter. Weingart testified on direct examination that he could not remember whether it was Littleton or Lanzarin who testified that the shooter had a distinguishing eye feature. Bongiorno testified on direct examination that he interviewed Figueroa at the hospital and did not recall if Richard had mentioned anything about the shooter's eye.

[5] The State introduced a certified copy of title from the Illinois Secretary of State's Office for a 1974 Chevrolet, with the owner listed as Keith Hoddenbach. Following this, the defense moved also for a directed verdict, which was denied.

[6] Defendant also called CPD Detective William Kaupert. On December 11, 1984, he was assigned to the violent crimes unit, and received an assignment to go to 1901 North California, a hot dog stand. He testified that one of the victims had testified to the shooter's distinguishing eye feature, and further admitted that as an investigator, such a facial feature would have been an important feature to put into the composite description. However, his notes did not contain any description regarding the offender's eyes.

When he first saw the car, he was about two blocks from the restaurant. He saw the car a second time about a block away from the restaurant, a few minutes before the shooting.

¶ 54    Rivera testified that once he entered the hot dog stand, he was there not "even five minutes" before the shooting occurred. In the restaurant, Rivera was playing a video game when he saw a person come with a gun. The person opened the doors, came inside, and then started firing towards the counter, then to the pay telephone, and then towards Rivera. Rivera ran for cover between two gunshots and hid behind the video games. When Rivera emerged again, the shooter was gone. Rivera was wounded in the buttocks.

¶ 55    Rivera went to the hospital, and police interviewed him there. Rivera looked at "hundreds of photos," where police showed him pictures of individuals. He picked out two photographs with the names "Sergio Mahon" and "Tony" because their photos "resembled him," meaning that they were similar in build and face to the shooter.

¶ 56    Rivera remained in the hospital for about a week, and then viewed a lineup about two to three days later. Sergio and Tony were not in the lineup. Defendant was not in the first lineup Rivera viewed, but was included in the second. Rivera identified defendant as the shooter in the second lineup.

¶ 57    On cross-examination, Rivera testified that he had not been told by anyone who to pick out in the lineup. He indicated again that defendant was the shooter and who he picked out in the lineup. Rivera also identified defendant in court, as well as the shotgun used. Rivera admitted to being a member of the Latin Disciples, and that the sign flashed by the occupants of the blue car signified that they were also fellow gang members. Rivera stated that defendant had been seated in the passenger seat of that car, but that he could not make out who the driver was. Rivera knew

Sergio Mahon based on prior interactions, but if either Tony or Sergio had shot him, he would have told the police.

¶ 58                                  10. Laura Maglaya

¶ 59    Maglaya was called by the defense. She testified that she was defendant's girlfriend and common-law wife, and that they had been living together on December 11, 1984, with their daughter, Samantha. December 11 was their daughter's birthday. Maglaya worked from 8:30 a.m. to 4:30 p.m., picked Samantha up from school, and brought her home. She and defendant had plans to celebrate Samantha's birthday with defendant's aunt, Lucy Rosario, and Rosario's sons "Tony" and "Juju." She arrived home at their residence at 5:30 p.m., and defendant was already there. Rosario arrived at 6:30, when they had just finished eating. They proceeded to open presents. Rosario and her sons left at 9:00 p.m. Maglaya gave Samantha a bath, and then everyone went to bed.

¶ 60    Maglaya was shown a picture of a shotgun and identified it as the one that had been located in their bedroom closet. She described it as the "house gun," and that she had seen it for the first time a few days prior when "someone came to the door," although she did not know who it was. defendant and the individual talked for a few minutes, and then defendant put the gun in their bedroom. On Wednesday, December 19, defendant was arrested while Maglaya was at work. She had not seen the gun since the Sunday or Monday before his arrest.

¶ 61    On cross-examination, Maglaya testified that defendant's blue 1974 Monte Carlo was gone following his arrest. Maglaya then stated that she saw the gun on December 17 and the morning of the 19th. She did not know where the gun was on December 11. When asked what she did after she found out defendant had been arrested, Maglaya admitted that she did not go to the police station and did not tell them that defendant had been with her on December 11. However, she

stated that she did tell Detective Kaupert of defendant's whereabouts the day of the shooting after he was arrested. She did not take Rosario or anyone else down with her to the station to corroborate defendant's whereabouts. She did not give a written statement to the police.

¶ 62     On redirect examination, Maglaya testified that the police never came to interview her. On recross examination, Maglaya testified that she went to the police station the night defendant was arrested. She talked to Kaupert but did not speak with an assistant state's attorney.

¶ 63                                    11. Lucy Rosario

¶ 64     Rosario was called by the defense and testified that she was defendant's aunt. On December 11, 1984, she was at work until 5:15 p.m. She had plans to go to defendant's home for his daughter's birthday. She lived about 10-15 mins from the defendant home, and arrived there around 6:20 or 6:30 p.m. Samantha, Maglaya, and defendant were there. She left around 8:55 p.m. On cross-examination, Rosario testified that she and Maglaya had spoken about the alleged murder and at what time it allegedly occurred.[7]

¶ 65     Following jury deliberations, defendant was convicted of the murder of Martinez, and attempted murder and aggravated battery of Figueroa. The trial court merged the two murder counts into one count, and the aggravated battery counts into the conviction for attempt murder of Figueroa. Defendant's counsel moved for a new trial, which was denied by the trial court on March 11, 1986. Following a sentencing hearing on March 12, 1986, the trial court sentenced defendant to consecutive terms of imprisonment, 80 years for murder and 30 years for attempt murder.

¶ 66                          B. Direct Appeal (*Hoddenbach I*)

---

[7] After the defense rested, the State re-called Detective Kaupert to rebut Maglaya's testimony. Kaupert testified that he did not remember having any conversation with Maglaya.

¶ 67 On direct appeal, defendant challenged the trial court's denial of his motion to quash and suppress. *People v. Hoddenbach*, No. 1-86-0857, 169 Ill. App. 3d 499, 500 (1988) (*Hoddenbach I*). Specifically, defendant argued violation of his fourth amendment rights, in that there were no exigent circumstances that justified his warrantless arrest. *Id.* at 503. This court rejected defendant's claims, holding that the trial court had properly found that that there were exigent circumstances to justify the arrest, the police had made a good faith effort to obtain a warrant, there had been no deliberate or unjustified delay by the police to obtain a warrant, probable cause had existed at the time of arrest, and that overall, the police had acted reasonably given the circumstances of the requisite alleged crimes. *Id.* at 504-505. As such, we affirmed the denial of the motion to suppress and the overall outcome at trial. *Id.* at 506.

¶ 68                    C. First Postconviction Petition (*Hoddenbach II*)

¶ 69 On January 3, 1992, defendant filed his first *pro se* postconviction petition. The petition essentially alleged four claims. First, defendant alleged ineffective assistance of trial counsel where defense counsel had, *inter alia*: (a) called Rivera as a witness, who had undermined defendant's alibi defense when he identified defendant as the shooter; and (2) failed to tender a jury instruction that prohibited prior inconsistent statements of three prosecutorial witnesses to be used against him as substantive evidence. Second, defendant alleged "improper prosecutorial conduct" where the State, in violation of a prior court ruling, elicited testimony from Detective Howe that allowed the jury to conclude that defendant had been implicated in the shooting by his co-defendant, Maldonado. Third, defendant challenged the constitutionality of his consecutive sentence for multiple offenses arising out of a single incident. Fourth, defendant alleged that the trial court had abused its discretion by imposing an extended sentencing term. Fifth, defendant

alleged ineffective assistance of appellate counsel, in that appellate counsel failed to argue on direct appeal that trial counsel's performance was objectively unreasonable.

¶ 70    On January 14, 1992, the postconviction court summarily dismissed the petition, finding that the petition raised claims that defendant could have raised on direct appeal. We affirmed the circuit court's dismissal in *People v. Hoddenbach*, No. 1-92-1525 (May 19, 1994) (unpublished order under Supreme Court Rule 23) (*Hoddenbach II*).

¶ 71         D. Successive Postconviction Petition – Second-Stage Proceedings (*Hoddenbach III)*

¶ 72    On April 25, 2002, defendant filed a second postconviction petition, which is the subject of one of the consolidated appeals before us today, specifically No. 1-09-2393. Therein, he requested a new sentencing hearing, arguing that the United States Supreme Court's recent decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), applied retroactively to his conviction.[8] According to defendant, pursuant to *Apprendi*, the imposition of his extended-term and consecutive sentences was unconstitutional.[9]

¶ 73    Defendant was appointed postconviction counsel. On September 17, 2003, the State filed a motion to dismiss the petition, arguing, among other things, that *Apprendi* did not apply retroactively to defendant's conviction. The postconviction court granted the State's motion that same day.

---

[8] *Apprendi* held that the length of criminal sentences cannot be enhanced above the limits provided by statute, unless the jury finds the presence of specific aggravating factors giving rise to the enhancement, beyond a reasonable doubt.

[9] On June 5, 2002, defendant filed a supplement to this petition, therein which he argued that his consecutive sentences were improper because the offenses were committed during a single course of conduct. The record does not reflect that the postconviction court ruled on this motion.

¶ 74 We affirmed the postconviction court's decision in *People v. Hoddenbach*, 1-04-1181 (April 28, 2005) (*Hoddenbach III*).[10] Prior to addressing the merits of the dismissal, we observed that, on appeal, both parties agreed that defendant's postconviction counsel had failed to file a Supreme Court Rule 651(c) certificate, therefore indicating that counsel had failed to consult with defendant or review the underlying trial record. Defendant argued that failure to comply with Rule 651(c) warranted automatic remand of the matter, while the State contended that a remand was not necessary because the single issue raised in the petition was a question of law that was frivolous and patently without merit, thus constituting harmless error.

¶ 75 We agreed with the State, holding that because the petition centered on a purely legal issue, "no amount of scouring the record, multiple meetings with defendant, nor any amendment of the petition" could have prevented dismissal. Thus, we found that the Rule 651(c) was harmless. As to *Apprendi*, we noted that our supreme court had recently decided *People v. De La Paz*, 204 Ill. 2d 426 (2003), which reaffirmed that *Apprendi* did not apply retroactively to cases where the direct appeal process had already concluded after 2000, when *Apprendi* was decided. We found that defendant's direct appeal process concluded long before *Apprendi*, and thus, defendant could not have obtained relief under any set of circumstances.

¶ 76 On March 28, 2007, our supreme court denied defendant's motion for leave to appeal in a supervisory order. 223 Ill. 2d 654 (2007). However, the court also issued the following order: "In the exercise of this Court's supervisory authority, the judgment of the Appellate Court, First

---

[10] We note that the *Hoddenbach III* order is no longer publicly available. The State attached the order to a response brief on appeal, and we solely look to it to provide its procedural history.

District, in *People v. Hoddenbach*, case No. 1-04-1181 (4/28/05), is vacated, and the cause is remanded to the circuit court for the purpose of demonstrating compliance with Rule 651(c)."[11]

¶ 77    Following remand, postconviction counsel was appointed to the case. On January 7, 2009, counsel reported to the court that he had visited defendant and learned that initial postconviction counsel in *Hoddenbach III* did not have any contact with the client. New counsel indicated that he would be preparing an affidavit to comply with Rule 651(c). He also noted that defendant had "expressed the wish to file a successive post-conviction petition bringing forward newly discovered evidence of his innocence," which defendant had already prepared himself.

¶ 78    On April 30, 2009, counsel for defendant filed a new Rule 651(c) certificate. Therein, counsel stated that he did not have any changes to add to the petition already on file. However, counsel attested that, to his knowledge, that the operative petition did not contain the total sum of defendant's postconviction contentions, specifically in that defendant had a "reasonable argument" for his innocence and had compiled multiple affidavits from individuals who had previously testified against him and then recanted their testimony. On May 14, 2009, counsel for defendant filed a motion for leave to amend the petition based on those contentions.[12]

¶ 79    On June 11, 2009, counsel filed an additional Rule 651(c) certificate, wherein he attested to consulting with his client and sought to add two further issues to the petition. Counsel also filed

---

[11] In the intervening time between *Hoddenbach III* and what we will call *Hoddenbach V*, defendant also filed a petition for relief from judgment pursuant to Section 2-1401(f) of the Code of Civil Procedure, 735 ILCS 5/2-1401(f) (West 2006), which alleged that the sentencing court lacked statutory authority to impose an extended sentencing term. On December 4, 2006, the postconviction court granted the State's motion to dismiss and denied the 2-1401 petition. We affirmed the court's ruling on October 5, 2009, in *People v. Hoddenbach*, No. 1-07-0130 (*Hoddenbach IV*) (October 5, 2009) (unpublished order pursuant to Rule 23).

[12] The record also reflects that defendant's counsel responded to a motion to dismiss filed by the State. Therein, counsel argued, among other things, that the court should delay its ruling based on the Rule 651(c) issue, as counsel had previously expressed to the court that amendments were necessary to comply with the rule. Counsel attached the proposed amended petition as an exhibit.

an objection to separating defendant's *pro se* petition from the proposed amended one. That same day, the postconviction court entered an order, which was memorialized in a certified report of disposition, indicating that the "successive petition for postconviction relief based on Apprendi is denied. The leave to file additional pleading is also denied. Order allowing additional pleadings is denied."[13]

¶ 80    On July 9, 2009, defendant's counsel filed a motion to reconsider. Counsel contended that the postconviction court had originally allowed for amendment of defendant's *pro se* petition on May 14, 2009, rather than proceed in "piecemeal fashion." The motion was denied, and a timely notice of appeal was filed.

¶ 81    E. Successive Postconviction Petition – Third-Stage Proceedings (*Hoddenbach V*)

¶ 82    1. Petition and Accompanying Documentation

¶ 83    On July 8, 2009, defendant filed a successive postconviction petition, asserting claims for actual innocence and ineffective assistance of counsel. As to his actual innocence claims, defendant claimed that he had "gathered [newly discovered] evidence of his actual innocence that was unavailable for one reason or another prior to *** 2006." Defendant asserted that he had obtained recantations of numerous eyewitnesses, and that the police had coerced false testimony against him. As to his ineffective assistance of counsel claims, defendant alleged that his trial counsel, in violation of *Strickland v. Washington*, failed to investigate and interview an individual named Sabrina Vazquez, who would have offered possible exculpatory testimony on his behalf.

---

[13] A written order accompanied this disposition which provided, in pertinent part, that: (1) on April 30, 2009, defense counsel had filed a limited 651(c) certificate; (2) on May 14, 2009, defense counsel filed a "motion for leave to amend the previously filed successive petition"; and (3) on June 11, 2009, defense counsel filed a supplement to "the amended petition filed on April 30, 2009." The matter was then placed off call.

Defendant also alleged that trial counsel had failed to investigate statements made by his co-defendant, Maldonado. In support of his petition, defendant attached numerous affidavits, including those from: (1) Maldonado; (2) Carranza; (3) Figueroa; (4) Rivera; and (5) Vazquez.[14]

¶ 84     Maldonado's affidavit, dated March 22, 2008, averred that he had received a shotgun from someone named "Carlos" on the day he committed an armed robbery. The police began looking for Maldonado, found him, and asked him about a shooting that had occurred in a restaurant. Maldonado stated that he did not know anything about the shooting, and that the police threatened him and began to "beat him up." Maldonado asserted that he "told them who he sold the shotgun to," in that he had sold a shotgun to a "guy [he] had just met for the first time after I did the robbery home invasion." He stated that the police had him "look at some gang books" and that he picked defendant's photo. The police asked if that was whom Maldonado had sold the shotgun, and he said that he had sold it a man named "Popeye." The police subsequently arrested defendant. Maldonado averred that police continued to assault and threaten him and told him that he was going to implicate defendant for the shooting. Maldonado asserted that he "lied on [defendant] to save [him]self and in the process had sent an innocent man to prison." He stated that "his friend Carlos was the one who killed that kid in the restaurant" when Maldonado asked him for the shotgun.

---

[14] Other affidavits included those from: (1) Edwin Suarez (2) Alan Mark Hoddenbach, defendant's brother, who stated that defendant had been celebrating his daughter's birthday on December 11, 1984; (3) Derral K. Moore, an individual whom Maldonado claimed to have been with that day, but who denied such contact with either Maldonado or defendant; (4) Louis Rivera, who stated that he had been with Maldonado the day of the shooting, had been questioned by police, and had never seen defendant that day; and (5) Orlando Figueroa, who averred that he reviewed a statement by Maldonado, which purported to claim that Maldonado had come to his home on December 11, 1984, to pick up a shotgun. He denied ever owning a weapon, or that anyone came to his residence that day.

¶ 85    Carranza's affidavit averred that although he had told police that the shooter "could not be identified," the police had told him that "they w[ould] tell me who did it and what I should say." He further attested that he had been told who to pick out in the lineup and later in court. Carranza averred that the shooter had "his face and head covered and there [was] no way anyone could identify the person that did it."

¶ 86    Figueroa's affidavit averred he had told police that he "did not know who shot" him, and that he had not been able to see the shooter's face because he had been wearing a ski mask. Figueroa further attested that, while at the police station, he had been shown a picture of defendant and was told to pick him out in the lineup. He stated that the police had indicated that they would "tell him what to say in a statement about what took place that night," despite him continuing to tell them that he did not know who shot him. He asserted that the police told him to "shut up" and "do what they told him to do" because otherwise, he would be "going to jail for not helping them lock up [defendant]." Figueroa asserted that both "[CPD] and the State's Attorney['s] Office had [him] lie in [his] statement [and] in court *** so that they could send *** [defendant] to prison [and] close their case." Figueroa concluded by stating that [defendant] was not the one who shot him, and that he had "lived in guilt for over 20 years [sic]" because he had "allowed both the [CPD] [and] the State's Attorney['s] Office to use [him] to send defendant to prison[.]"

¶ 87    Rivera attested that on the night of the shooting, he had been walking a family member home when he saw "Sergio Mayett and Tony, two Latin Kings." After the shooting, when he was brought to the police station, he identified "Sergio" and "Tony." A week later, the police approached him, showed him a picture of defendant and two others, and said that "these are the guys we want you to say who did it, and here is a picture of his car." Rivera asserted that he was

also brought to and shown defendant's car. Rivera stated to police that this was not the car he had saw on the night of the shooting. Police responded by saying that if Rivera did not identify defendant, "the next time something happened around the neighborhood[,] [he] was gonna go down for it." Thus, Rivera "did what they said and changed what [he] told several officers when this happened." Rivera attested that "[f]rom that time on we all stuck with what they told us and identified these guys out of the line-up and even went with this story all the way to trial and got them convicted." Rivera further stated that, prior to trial, he had communicated with Maldonado and defendant on the phone and told them he would tell the truth, which was why defendant's trial counsel had called him as a witness. However, when called to the stand, Rivera "got scared of what the gang-crime detectives told [him] they would do to [him,] so [he] got on the stand and lied." Rivera attested that he "said what the detectives wanted [him] to say and the state's attorney *** prep[ped] [him] for trial." Finally, Rivera stated that he made several attempts to contact defendant to sign an affidavit on his behalf because he had "helped put an innocent man away."

¶ 88    The petition also contained a copy of Vazquez's statement to Detective Weingart and an assistant state's attorney, dated December 19, 1984. In summary, the statement provided that on December 11, 1994, Vazquez had been at a liquor store near the location of the shooting and heard gunshots on the way to a friend's apartment. While standing in the hallway of the apartment, Vazquez encountered an individual she knew as "Duce," which was Maldonado's street name. He was wearing an entirely black outfit. Vazquez asked him about the gunshots, and Maldonado stated, "he knew about them" and that "he was the one who shot those kids." Maldonado further told her that if she said anything, "something would happen to [her]." Vazquez also noticed that there was a barrel shotgun sticking out of his jacket, and that he was breathing heavily. Maldonado asked Vazquez to hide him, and she refused. Maldonado then left the hallway and got into a car.

¶ 89    On August 25, 2010, postconviction counsel was appointed to represent defendant on the amended petition. On June 9, 2015, defendant's counsel filed a Rule 651 Certificate, which stated he had consulted with defendant, obtained and read the trial transcript, and planned to file an amendment to the petition. That day same, counsel filed a supplemental petition, which argued that defendant was actually innocent because: (a) Maldonado was the actual shooter; (b) Vazquez had told police that Maldonado had admitted to her that he had committed the shooting; and (c) various witnesses who had testified against defendant were told to identify him as the shooter, despite telling police that the shooter was unidentifiable due to the ski mask he was wearing at the time. The supplemental petition did not contain any additional claims against defendant's defense counsel, and attached the previously filed affidavits of Figueroa, Carranza, and Rivera. It also attached new affidavits from, of relevance here: (a) Maldonado, dated in August 2013; (b) Lanzarin; and (c) Vazquez.[15]

¶ 90    The new Maldonado affidavit reiterated that he had sold a shotgun to defendant, but now averred it was him who had killed Martinez and that he had previously given a false statement as he believed he "would [have] gotten a break from" a separate conviction.

¶ 91    Lanzarin's affidavit averred that the shooter had been wearing a bandanna over his head "down to his eyes" and a cloth covering his face, and his eyes had been the only visible things on his face. Lanzarin asserted that he could not identify the shooter, but that while at the lineup, police had told him to identify defendant "or else we would be charged." Lanzarin averred that he did so because he had been "young and scared."

---

[15] The supplemental petition did not contain any claims for ineffective assistance of counsel, but the State and the defendant agreed to move forward on those claims against trial counsel as outlined in defendant's *pro se* petition.

¶ 92    Vazquez's affidavit attested to similar facts to the statement she provided to police in 1984. She further stated that after she had given a statement, she had never been contacted by lawyers and never went to court on the matter.

¶ 93                                    2. Evidentiary Hearing[16]

¶ 94    On April 19, 2016, the State filed an answer to defendant's petition, agreeing to proceed on a third-stage evidentiary hearing on the following claims: (1) whether defendant's trial counsel was ineffective for failing to interview, investigate, or call the listed witnesses outlined in the petition; (2) whether defendant was actually innocent; (3) whether appellate counsel was ineffective for failing to allege ineffective assistance of trial counsel by failing to investigate Vasquez; and (4) whether the State had advanced perjury at trial based on the affidavits of Rivera, Vazquez, Carranza, and Figueroa. The State generally denied the rest of the petition's allegations. The matter was then set for evidentiary hearing, beginning on January 23, 2020.[17]

¶ 95                                    a. Sabrina Vazquez

---

[16] As to the ineffective assistance of counsel claims, the parties stipulated that: (1) defendant had been represented by Dan Murray from March 8, 1995 to March 24, 1986; (2) both sides had interviewed Murray in preparation for the hearing; and (3) if called to testify, Murray would state, under oath that: (a) he had represented defendant during the pre-trial discovery stage and was the only lawyer to represent him during his first-degree murder trial; (b) in 1985, he had reviewed all of the discovery tendered by the State, including all police reports, and only recalled interviewing defendant's girlfriend at the time; (c) he no longer retained the trial file as the matter concluded 34 years ago; (d) "due to the passing of time," he could not recall Vazquez or having interviewed her; and (e) he did not recall the names of defendant's aunt or girlfriend, but did recall speaking with them regarding defendant's location at the time of shooting.

[17] Counsel for defendant sought multiple continuances to investigate the affidavits filed in support of the petition. Additionally, counsel for defendant passed away in 2017, and the case was subsequently reassigned to other attorneys within the Office of the Public Defender.

¶ 96    Vazquez was called by defendant. She testified that she had been convicted in 1999 for selling drugs, had been convicted in the past for residential burglary, and served a sentence at the Illinois Department of Corrections. She had not since been convicted of any crime.

¶ 97    Vazquez testified that on December 11, 1984, she was 14 years old and lived with her mother at Fullerton Avenue and Western Avenue. Around 7:08 p.m., she was in a liquor store located at California Avenue and Armitage Avenue playing video games with other friends. She heard gunshots and later learned that a homicide occurred. She talked to CPD afterwards and gave a statement.

¶ 98    When she left the liquor store alone to go to a friend's residence, she heard gunshots. She walked to California Avenue and Point Street, where her friend resided. When she got there, she encountered someone she called "Duce," who she knew before "for a couple of years." She did not know his real name, as Duce was his street name, but his last name was "Maldonado." He was wearing all black clothing. She testified that Maldonado was "bragging on a situation," meaning "what had happened as far as the shooting and said he did it." She indicated that Duce wanted help because "he was on the run of it." Duce opened his coat and she saw a gun but could not identify what kind it was. Vazquez asked Duce "if he was for real" as to whether he was responsible for the shooting and "he said yeah." Vazquez did not help him because "she wasn't getting into that situation" and told him as much. He responded that "it could happen to [her]." After their conversation, Duce drove off in a car with some people, and that was the last time she ever saw him.

¶ 99    Vazquez did not know if he had been serious, but she discussed the conversation with her mother afterwards. She later met with police officers that same day after her mother called them. The police officers drove her around the area, specifically to a bowling alley off Diversey Avenue

because they were "trying to see if [she] could see Duce." Vazquez testified that this upset her mother, so then the search ended. Vazquez did not remember if she told officers what Duce looked like, but did tell them that he was wearing all black.

¶ 100  Vazquez did not remember speaking to a state's attorney about this encounter. She was never contacted by any attorneys before and during defendant's trial but was recently contacted by one of his family members regarding reopening the case. Vazquez was not familiar with Daniel Murray, defendant's trial defense counsel.

¶ 101  On cross-examination by the State, Vazquez testified that she went to the police station, told them that what Duce had told her, and that the police wrote this information down. Vazquez stated that police brought her back to the station a week later in order to a view a lineup. In that lineup, she identified Duce as the person she saw that night. Vazquez did not identify defendant, as she had not seen him that night.

¶ 102  Vazquez admitted that she never saw the shooting but was near it. She did not see Maldonado outside of the liquor store. When asked if Maldonado showed her the gun, she responded that he "opened his jacket." Vazquez stated that Maldonado was wearing black pants, a black jacket, and earmuffs. Vazquez did not recall if he was wearing a scarf. Vazquez did not know the make of the car he left in, or how many people were in the car. When asked if Maldonado ever told her that he had committed a murder, Vazquez responded that he told her that "he just shot up some kids." When asked if Maldonado had told her whether anyone had died, Vazquez responded that she did not know and did not ask.

¶ 103  Vazquez was shown a copy of her original statement to the police, where she was shown the name "ASA Jordan." Vazquez did not recall who wrote out her statement, only that she read it

before signing it. Vazquez never testified before a grand jury, and never went to any court proceeding involving Maldonado.

¶ 104   Vazquez confirmed that she signed her affidavit in 2015, in her apartment in Rockford, Illinois. She did not remember who came to assist her with it, but that it was a black male and one female. Vazquez testified that she wrote out her statement as she remembered it, gave it to the two, and then they showed up to her residence at a later date with the affidavit typed out for signature.

¶ 105   On redirect examination, Vazquez testified that she stood by her statements as to what she witnessed that night. She confirmed that the facts in her affidavit were the same ones contained within her statement to the police.

¶ 106   The court then questioned Vazquez. Vazquez testified that she had known Duce for "a couple of years," that he was Hispanic, and that she did not know if he was in a gang. She testified that he was about the same height as her, at five foot three inches. She stated that Duce "flashed" his gun at her, but that she did not know what type it was and had only seen the barrel. She believed it was probably a bigger gun based on the way it was positioned. However, she did not get a good look at it. The court asked Vazquez what Duce's exact words were to her, and she said that they were that he had "just shot up a place with some kids in there." The court asked if Duce had stated if he had done it alone, and she responded, "He didn't say. I didn't ask either."

¶ 107                                  b. Roberto Rivera

¶ 108   Rivera was called as a witness by counsel for defendant. Rivera testified that he was currently serving six-years' time for a drug conviction in the Illinois Department of Corrections, and that he also had other felony convictions.

¶ 109   Rivera testified that he remembered the events of December 11, 1984, because that was the day he was shot at the restaurant. Rivera testified that he was playing a video game when someone,

either Lanzarin or Figueroa, tapped him on the shoulder and said, "hey, this guy is pointing a gun at you." He turned around but did not see anyone, so he went back to playing video games. Rivera then heard shots and looked back to see a shooter. He went for cover but got hit on the side of his left buttock. Rivera testified that he had not been able to see the shooter because the person had been wearing a mask.

¶ 110   After he was shot, the police arrived and brought Rivera to the hospital. Rivera testified that they "gave [him] books and asked who shot [him]." The book contained photos of members of the Latin Kings gang. The police asked Rivera if he recognized anyone in the books, and he told them he did. He picked out "Sergio" and "Tony." Rivera testified that he did not remember their last names, but that Sergio's last name may have possibly been "Montoya."

¶ 111   Rivera was in the hospital for a week or two. Two CPD officers then came to get him, their names were possibly Sullivan, Quinn, O'Brien, Howard or Howe. Rivera testified that these officers "showed him cards in the parking lot" and then took him to the police station. They brought him up to the second floor to a room where a shotgun and an ID had been placed on the table. Rivera testified that the police told him "this is the guy right here." Rivera said that the ID on the table was not of Sergio or Tony, and he did not know who the person was. Rivera testified that he said nothing during these interactions.

¶ 112   The police then conducted a lineup, and Rivera testified that the officers kept telling him "you know who it is, all you got to do is point him out." Rivera further stated that the police continued to tell him that "whatever else goes down in the neighborhood, it's going to all fall on [him]." Rivera testified that he picked out the individual of whose ID they had shown him earlier. Rivera testified that the lineup lasted about 10-15 minutes, and that he had never seen the person he eventually picked out. However, he knew to pick him out because "they had told [him]" to. He

testified that the whole time, officers told him "just remember this guy here." Rivera said that "he did what they asked."

¶ 113   Rivera testified that the police also showed him a car parked at the police station and asked him if he recognized it. Rivera testified that he "just looked at them" and confirmed that it was the car, but he did not believe it was the vehicle involved in the shooting. Rivera did not tell police that he did not think defendant was the shooter, because "they were the ones dictating the pace." After Rivera picked out defendant in the lineup, he was told to leave. He testified that no one from CPD ever contacted him again, and he did not recall if a state's attorney ever contacted him either.

¶ 114   When asked if he was ever brought to court to testify against defendant, he stated he went "against his will." Rivera stated that he was leaving school that morning, and when he was leaving, an officer came up to him and brought him to the courthouse. Rivera stated that he "didn't want to be there" but was told by the judge that if he tried to leave, "he was going to lock [him] up." Rivera did not recall speaking to any attorneys that day, including defendant's trial counsel. He remembered being called to testify, and he testified as to what "the police said to say." Rivera did not recall which attorney questioned him that day.

¶ 115   When asked if he recalled what his testimony was, he responded "more or less." He recalled that his testimony was that he was walking down the street with a family member to bring her home, when he "ran into some guys in a premiere vehicle," a Gran Torino, and that Sergio and Antonio were in the car. He recalled identifying defendant in court because "the police said to do it." When asked if he had testified that the police had told him to pick out defendant as the shooter, Rivera said he did not. When asked if his previous testimony was that defendant was the one that shot him, Rivera testified that "it wasn't true" and that he had testified as such because of his negative interactions with police officers in his area. When asked if the police had ever physically

abused him while they were questioning him, Rivera testified that they had "in general, in the past, but not then." He admitted that he had been in the Young Latin Organization Disciples gang at the time.

¶ 116   Rivera confirmed that he did not know defendant, but that he had spoken with him one time over the phone and that Maldonado had made the phone call. When asked how he knew Maldonado, Rivera testified that he was a "friend of the family" and that Maldonado "used to come to the house." During this phone conversation, Rivera told them he was not going to go to court, because he knew "that this guy didn't shoot me" as the shooter had been wearing a mask. When asked if he had identified defendant in court as the shooter, he confirmed that he did.

¶ 117   On cross-examination, Rivera testified that he was serving a six-year sentence for manufacturing and delivery of drugs. He was also serving a three-year sentence for forgery, and a sentence for 9 years for aggravated intimidation. He had previously been convicted of possession of a controlled substance in 1992, possession of a weapon by a felon in 1993, possession of a controlled substance in 1995, and unlawful use of a weapon by a felon in 1999.

¶ 118   Rivera testified that the shooter had been wearing a black ski mask, and that he could only see the shooter's eyes because of the mask. He could not recall what the shooter had been wearing, but that it had been "all black[,] maybe."

¶ 119   Rivera stated that no one had approached him to write his affidavit, and that he had decided to do so on his own. He reiterated that he had made the decision to lie at trial. When first asked if a state's attorney had told him to lie, he responded "they all [say] lie." When asked multiple times whether a state's attorney had asked him to lie, Rivera answered that "he was brought there" and did not "know who at the moment had [him]." He did not recall if there were police officers in the courtroom when he initially testified.

¶ 120    Rivera was then presented with his previous testimony at trial. He was asked if he recalled being asked by defendant's counsel if he had picked out Sergio Mahon and whether that person may have been the shooter, or if Sergio resembled him. Rivera responded that he did not recall being asked that question. Rivera was asked if he recalled testifying that no one had told him to pick someone out in a lineup. Rivera responded that he did not recall. Rivera also did not recall his testimony on cross-examination that he had seen someone driving a car that had gestured gang signs at him. Rivera was asked if he recalled his testimony that defendant had been the one sitting in the passenger seat of that car. Rivera responded that the police had told him to say it was defendant, and that they had further told him "every little thing to say at trial" and to "bottom line, blame him." Rivera was asked if the police had made up the story about defendant being in the car and gesturing gang signs at him. Rivera responded that it had not been his testimony that the gang signs had been directed towards him, and that he had never seen defendant before. Rivera admitted that his current testimony about the police having a shotgun and ID on the table when he arrived for a lineup was not in his affidavit, "but that doesn't mean it didn't happen."

¶ 121    The court then questioned Rivera. When asked if he remembered someone in the neighborhood who went by the name "Duce," Rivera testified that his real name was "Rafael Maldonado" and that he was not tall, perhaps about five feet. Rivera confirmed that Maldonado had been a Latin King, and that it was fair to say that Rivera's gang and the Latin Kings had been "at war with each other." Rivera testified that Maldonado would have had reason to shoot him "being that [he] was a disciple." As to the lineup, Rivera testified that he had viewed it with only officers present in the room, where other witnesses were outside.

¶ 122                                c. Jesse Lanzarin

¶ 123   Lanzarin was called by defendant. He stated that his name was "DeJesus K. Lanzarin" but went by Jesse. On December 11, 1984, he was at the hot dog stand playing video games. Lanzarin testified that a man stepped into the restaurant, held the door open with one foot, and pointed a shotgun at Rivera. The shotgun did not go off, so the man stepped back outside, and Figueroa told him and Rivera that a man had come in and pointed the gun at Rivera. Jesse testified that all three of them stood watching the door, and the man re-entered. The man began shooting over at the video games, then at the pay telephone, and then towards the counter. When asked if he could recall how many gunshots were fired, Lanzarin stated that it "could have been three, four, five," that he did not recall, and that he was scared for his life. Lanzarin testified that he did not see the shooter's face, just his eyes, and that he was wearing a bandanna that covered his eyes "all the way down." He also had another bandanna covering his head, ears, and "everything else."

¶ 124   Lanzarin testified that he spoke to police outside the hot dog stand and then at the police station. The police then took him to a lineup, pointed out defendant to him, and said he was the shooter. Lanzarin testified that the police warned him that if he did not say it was defendant, they would put drugs and guns on him and "lock [him] up." Lanzarin subsequently identified defendant in the lineup.

¶ 125   On cross-examination, Lanzarin admitted that he had been convicted of armed robbery, and that he had been in custody at the time he had testified at defendant's trial. Lanzarin stated his prior testimony at trial had been that the shooter wore a bandanna covering his head and ears, and some sort of beanie cap but he did not remember the color. When asked if he had testified under oath that he could not see the shooter's face, Lanzarin said that he did not recall if that was his statement, but he could not see the shooter's face when he came into the restaurant. When asked if he recalled testifying that he was able to see the shooter's eyes, Lanzarin responded "that's all

- 34 -

you could see, but it happened so fast you don't even remember." Lanzarin did not recall testifying that he could see the shooter's nose, mouth, or moustache. He did not recall if he had testified that one of the shooter's eyes had been "hanging low." Lanzarin stated that he had identified defendant in a lineup because the police had stated that they would put "guns and drugs" on him if he did not.

¶ 126    The court then questioned Lanzarin. Lanzarin admitted that he used to be a "gang banger" and been involved with the police before. He had been in the YLO Cobras, and the individuals shot on December 11 were Cobras. Lanzarin did not know what gang the shooter was from, but he knew it was a gang incident.

¶ 127    Lanzarin admitted that he had identified defendant as the shooter at trial, and that he had never seen him or known him before the trial. Lanzarin did not remember which police officer had threatened him, but that it had been at the station where he had been seated with an officer in a room with a two-way mirror. During the lineup, Lanzarin testified that the police officer had said to him "that's him right there, point him out." Lanzarin admitted that he had not mentioned anything at trial regarding the police threatening to frame him. When asked if he remembered giving a description of the shooter to the police at the restaurant before the lineup, Lanzarin responded that he had told them that the shooter had a bandanna from his eyes all the way down. He did not know the shooter's race, height, weight, or eye color because he had not been able to see anything beyond the shooter's eyes.

¶ 128    As to his affidavit, Lanzarin testified that defendant's counsel had reached out to him. Before they did, Lanzarin had told "plenty of his friends" the story of what happened the night of the shooting. However, when asked if there was anyone that could be in a position to come to court and "do anything about it," Lanzarin responded, "not really."

¶ 129    On recross examination by the State, Lanzarin testified that that he had not received any deals with the State in exchange for his testimony at trial. On further examination by the court, Lanzarin stated that he had an armed robbery conviction from when he was 17 years old, was now 50, and that was his only conviction as an adult.

¶ 130    Following the end of testimony, defendant sought to introduce two unidentified affidavits into evidence. Counsel stated that they had been attached to the amended petition and were from two recanting witnesses who could not be located but requested the court to "acknowledge" that they had been signed and notarized. The court allowed them to be filed but noted that it was "hard to attribute much weight [to them] without seeing the witnesses and having them be put under oath [and] subject to cross."

¶ 131                                    3. Postconviction Court Ruling

¶ 132    On September 1, 2021, following the conclusion of the evidentiary hearing and closing arguments, the postconviction court entered an oral ruling on defendant's petition. The court denied the petition in its entirety.

¶ 133    The court first summarized the underlying trial proceedings. He noted that defendant was convicted at a jury trial, where the State had called four witnesses that identified him in court, and the defense had called one that had also identified defendant as the shooter. The court observed that some witnesses had described the shooter as a "shorter person with one eye lower than the other" and that the murder weapon had been found in defendant's residence.

¶ 134    The court observed that he had received 14 original affidavits, "enough *** so [the court] agreed to *** have this hearing," but that defendant had only presented three witnesses. With regard to Lanzarin, the court noted that, at trial, he had not testified that he had been coerced by any police officer, and today, Lanzarin was unsure which officer had threatened him. The court

also observed that Lanzarin had only talked to his friends about the incident until defendant's counsel had him sign an affidavit.

¶ 135   As to Vazquez, the court stated that she had described an encounter with Maldonado, as defendant's co-defendant, who had also been convicted for the same incident. The court pondered as to whether Maldonado's alleged statement constituted a "third party admission[] which might be admissible as a hearsay statement against somebody's penal interest." Even assuming the statement was admissible, the court questioned whether Vazquez's testimony could exonerate defendant, given that there was more than offender in this case.

¶ 136   As to Rivera, the following exchange occurred:

> "[POSTCONVICTION COUNSEL]: *** He was the victim of the attempted murder. This was a homicide plus an attempted murder.
>
> [COURT]: Okay.
>
> [POSTCONVICTION COUNSEL]: And he's the one that testified in Mr. Hoddenbach['s] case in chief. He was called by Mr. Murray and while on the witness stand under direct examination by Mr. Murray[,] he identified Mr. Hoddenbach as the shooter.
>
> [COURT]: Okay. And you say that was the fault of Mr. Murray?
>
> [POSTCONVICTION COUNSEL]: Essentially, yes.
>
> [COURT]: Did Mr. Rivera tell Mr. Murray that that's what he was going to say before he testified or are you saying he put him on cold?
>
> [POSTCONVICTION COUNSEL]: Judge, I believe Mr. Rivera's testimony was he never spoke to Mr. [Murray].

[COURT]: So he was called as a witness, he never even talked to his lawyer, the lawyer called him and he identified your client?

[POSTCONVICTION COUNSEL]: I believe that was his testimony before your Honor."

¶ 137   Turning to the merits of the petition, with regard to the ineffective assistance of counsel claim, the court observed that he had not been the presiding judge at trial, and thus was being "careful and cautious about reviewing common law records of what was available at trial and performance of counsel." He noted that defendant's trial counsel had been an "experienced defense lawyer at the time" and that he had been "practicing these types of cases with regularity at some point, certainly back then."

¶ 138   With regard to the actual innocence claim, the court stated that defendant had at some point become a "person of interest" to the police and that "four people had come into court identifying him as the offender," as well as the "witness who was called by [defense counsel]." The court acknowledged that there was now "some claim that there was some coercion by the police that was suggested as a basis for the identification" by at least two witnesses. Nevertheless, the court reiterated that the murder weapon had been found in defendant's residence, and that defendant had not provided any testimony as to how he had come to possess the shotgun.

¶ 139   The court concluded with the following:

"I'm looking at what's been presented here today and I have decide if this somehow shows actual innocence, ineffective assistance of counsel, or somehow that this new information would have changed the results of the trial had it been available *** and I'm not in any way prepared to say it has come close to meeting any of those criteria under any standard that I could apply.

I don't find the witnesses that testified at this third-stage hearing to be compelling or credible. I would note the extreme corroboration of the murder weapon being found in the defendant's home along with it *** five people identifying him at the trial that shows that the trial had valid integrity at the time, it was handled by Judge Kiley who sat in this building for many years. I'm just not finding error that indicates that there's some miscarriage of justice here by the trial. Nothing has been shown to me in this third-stage hearing to be persuasive.

*** *** ***

At the end of the day, I'm left with just what has been presented here and I'm not *** seeing the weight to find that he is entitled to a third-stage postconviction relief, so his petition is respectfully denied."

¶ 140 This appeal followed.

¶ 141 II. ANALYSIS

¶ 142 A. Postconviction Hearing Act

¶ 143 On appeal in *Hoddenbach V*, defendant argues that the postconviction court erred in dismissing his petition following third stage proceedings. In *Hoddenbach III*, defendant contends that the postconviction court's dismissal of his second-stage petition was also in error, where his counsel should have been allowed to amend his petition that eventually formed the basis of *Hoddenbach V*.

¶ 144 Before proceeding, we set out the applicable legal principles which govern our review. In cases not involving the death penalty, the Act provides a procedural mechanism in which a convicted criminal can collaterally attack a conviction by asserting that it resulted from a "substantial denial" of his rights either under the United States or Illinois constitutions, or both.

*People v. Harris*, 224 Ill. 2d 115, 124 (2007); 725 ILCS 122-1 (West 2008). The Act only contemplates one postconviction proceeding. *People v. Robinson*, 2020 IL 123849, ¶ 42. However, the procedural rule against successive proceedings may be relaxed on two grounds. *Id.* First, the petitioner may attempt to establish "cause and prejudice" for failure to assert a postconviction claim in an earlier proceeding. *Id.* Second, petitioner can assert a "fundamental miscarriage of justice" based on actual innocence, where, in nondeath cases, the petitioner is excused from showing cause and prejudice typically required in such proceedings. *Id.*; *People v. Ortiz*, 235 Ill. 2d 319, 330 (2009).

¶ 145   A postconviction proceeding in a noncapital case has three stages. *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). At the first stage, the postconviction court takes all well-pleaded factual allegations in the defendant's petition as true and must advance the petition to the second stage so longa s the court finds that it has stated the "gist" of a constitutional claim. *People v. Johnson*, 2021 IL 125738, ¶¶ 25-26.

¶ 146   If the petition advances to the second stage, counsel is then appointed for the *pro se* petitioner to make any necessary amendments to the petition. *Id.* ¶ 27. The postconviction court again takes all well-pleaded factual allegations as true at this stage, and the State may move to dismiss or answer the petition. 725 ILCS 5/122-4, 122-5 (West 2008); *People v. Johnson*, 2021 IL 125738, ¶ 27.

¶ 147   A petition may move to the third stage if the allegations and any accompanying documentation makes a substantial showing of a constitutional violation, which then requires an evidentiary hearing on the merits. 725 ILCS 5/122-6 (West 2018); *People v. Zumot*, 2021 IL App (1st) 191743, ¶ 19. A court may consider affidavits, depositions, oral testimony, or other evidence. 725 ILCS 5/122-6. In its discretion, after the evidentiary hearing, the court may enter "an

appropriate order with respect to the judgment or sentence in the former proceedings," which may include orders for "rearraignment, retrial, custody, bail or discharge as may be necessary and proper." *Id.*

¶ 148   At a third stage evidentiary hearing, the postconviction court serves as a fact finder, and is charged with determining witness credibility, deciding the weight of given testimony and evidence, and resolving evidentiary conflicts. *People v. Domagala*, 2013 IL 113688, ¶ 34. The court's decision will generally not be reversed on appeal unless it is manifestly erroneous. *People v. Coleman*, 2013 IL 113307, ¶ 98. "Manifest error" is "clearly evident, plain, and indisputable." *Id.* Thus, a postconviction court's decision will be considered manifestly erroneous when the opposite conclusion is clearly evident. *Id.*

¶ 149         B. Second-Stage Proceedings in *Hoddenbach III* - Appeal No. 1-09-2393

¶ 150   *Hoddenbach III* concerns a previous postconviction petition filed by defendant on the basis of *Apprendi v. New Jersey* that has made its way up through all levels of the courts and back. We briefly recite the procedural history.

¶ 151   As noted prior, our supreme court remanded *Hoddenbach III* to the postconviction court in order to demonstrate compliance with Rule 651(c). On remand, after appointing new counsel for defendant, counsel reported that defendant's previous counsel had never met with or contacted him, and that defendant sought to add additional substantive claims to the petition currently on file, including the actual innocence claims which form the basis of *Hoddenbach V*. Counsel sought and was denied leave to amend the petition. Defendant filed his notice of appeal on August 28, 2009, with the opening brief filed on September 3, 2010.

¶ 152   The State filed a response brief, and defendant's counsel subsequently filed a motion to stay proceedings on April 28, 2011. Therein, defendant argued that the appeal should be stayed

because the relief sought in *Hoddenbach III* had essentially been the postconviction court's consideration of his actual innocence claim, which was then pending before the lower court in *Hoddenbach V*. Defendant further stated that *Hoddenbach III* would "become moot if and when [he] receive[d] a ruling on the merits of his innocence claim in his 2009 petition[.]"[18]

¶ 153 Accordingly, the matter was stayed by this court on May 9, 2011, and remained so for several years. Following the conclusion of proceedings before the postconviction court in *Hoddenbach V*, defendant's reply brief in this appeal was filed on July 26, 2022. This court officially lifted the stay on the matter on September 12, 2022.

¶ 154 The State continues to argue that *Hoddenbach III* is moot because, although the postconviction court dismissed the *Apprendi*-based petition, it allowed defendant to present his actual innocence claims in a subsequent petition, which culminated in a third-stage evidentiary hearing. Thus, according to the State, defendant has already attained the relief he sought in *Hoddenbach III*, and any additional opinion as to whether the postconviction court erred in not allowing further amendment would be purely advisory. Defendant's counsel disagrees that the appeal is moot.

¶ 155 "An appeal is moot if no controversy exists or if events have occurred which foreclose the reviewing court from granting effectual relief to the complaining party." *In re Shelby R.*, 2013 IL 114994, ¶ 15 (citing *In re Marriage of Peters-Farrell*, 216 Ill. 2d 287, 291 (2005)). Generally, reviewing courts do not rule upon moot questions, render advisory opinions, or consider issues where the outcome will not be affected regardless of how those issues are decided. *In re Barbara H.*, 183 Ill. 2d 482, 491 (1998). However, our courts have recognized multiple exceptions to that

---

[18] The State filed a response to this motion, but there is no physical record available for viewing.

rule. See *In re Alfred H.H.*, 233 Ill. 2d 345, 355 (discussing the public interest exception, the "capable of repetition yet evading review" exception, and the collateral consequences exception to the mootness doctrine). Notably, defendant's counsel does not argue that, in the event we do find this appeal to be moot, the current controversy falls within any of the generally recognized exceptions.

¶ 156 We agree with the State and find that *Hoddenbach III* is moot. The record reflects that third-stage proceedings in *Hoddenbach V* adjudicated his actual innocence and ineffective assistance of counsel claims that his counsel attempted to present by amendment of the petition underlying *Hoddenbach III.* Indeed, defendant has already conceded as much, where in the motion to stay, he asserted that "[t]he relief sought in this appeal from the 2002 petition is the [postconviction] court's consideration of his claim of actual innocence, and *** this same claim is currently pending before the ***court in the 2009 petition." Defendant further stated that the appeal would become moot once defendant received a ruling on the merits as to his actual innocence claims in *Hoddenbach V.* Thus, defendant has received the relief he sought, albeit not the outcome he wanted, and any such order rendered by us as to whether the postconviction court erred in not allowing amendment would no longer be directly applicable to defendant, and only serves to set precedent in governing future appeals. See *In re Commitment of Hernandez*, 239 Ill. 2d at 201.

¶ 157 We do not express any opinion as to whether this appeal may have fallen within one of the mootness exceptions, as this was not argued by defendant. We also do not express any opinion as to whether the postconviction court properly denied the proposed amended petition based on its interpretation of the remand order in accordance with Rule 651(c), although the rule and our supreme court precedent appears to stand quite firmly in its interpretation of the rule. See Ill. S.

Ct. R. 651(c) (eff. July 1, 2017) (In a postconviction proceeding, postconviction counsel must file a certificate indicating that the attorney has "consulted with the petitioner *** to ascertain his or her contentions of deprivation of constitutional rights, *** has examined the record of proceedings at the trial and *has made any amendments to the petitions filed pro se that are necessary for an adequate representation of petitioner's contentions*."). (Emphasis added); see also *People v. Suarez*, 224 Ill. 2d 37, 48 (2007) ("The purpose underlying Rule 651 is not merely formal. *** Our analysis *** does not depend on whether the *pro se* or supplemental petitions *** did not contain potentially meritorious issues," as the analysis has always been driven by where "postconviction counsel does not adequately complete the duties mandated by the rule" and thus do not allow for "the limited right to counsel [to be] fully realized.") (Internal citations omitted)).

¶ 158   Having determined that *Hoddenbach III* is moot and no longer viable, we turn to the review of defendant's third-stage proceedings.

¶ 159          C. Third-Stage Proceedings – *Hoddenbach V* – Appeal No. 1-21-1177

¶ 160                                1. Actual innocence

¶ 161   Defendant argues that the postconviction court erred in denying him a new trial based on his actual innocence claims. Specifically, defendant contends that he presented newly discovered evidence from Rivera, Lanzarin, Figueroa, and Carranza, which all stated that they had been coerced by police to identify him as the shooter where the shooter had been otherwise unidentifiable. This, according to defendant, in combination with Vazquez's testimony, affidavit, and recorded police statement, is likely to have changed the result of the underlying trial.

¶ 162   The State responds that defendant's actual innocence claims rely almost entirely on recanted eyewitness testimony, which are inherently unreliable and only sufficient to overturn a conviction in extraordinary circumstances. Further, the State points out, not every eyewitness

recanted, pointing out that Littleton did not provide any affidavit or testify at the hearing. Thus, even if the court were to assume that the recanted testimony was reliable, the remaining evidence in the case is sufficient to support a dismissal of defendant's claims, citing *People v. Harris*, 2018 IL 121932, and *People v. Morgan*, 212 Ill. 2d 148 (2004), in support.

¶ 163    We now set forth the requirements of an actual innocence claim. It was defendant's burden to present evidence that was (1) newly discovered, (2) material and not cumulative, and (3) of such a conclusive nature that it would probably change the result on retrial. *Robinson*, 2020 IL 123849, ¶ 47. "Newly discovered evidence" is "evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence." *Id.* Evidence is considered "material" if it is relevant and probative of the petitioner's innocence. *Id.*; see also *Ortiz*, 235 Ill. 2d at 335 ("Evidence is considered cumulative when it adds nothing to what was already before the jury."). Finally, and what is considered to be the most important element of an actual innocence claim, evidence is "conclusive" when it refers to evidence that, when considered with the rest of the trial evidence, can be viewed as "probably lead[ing] to a different result." *Robinson*, 2020 IL 123849, ¶ 47.

¶ 164    Ultimately, the question before the postconviction court is "whether the evidence supporting the *** petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 48. This analysis is comprehensive and involves credibility determinations uniquely appropriate for trial judges. *Coleman*, 2013 IL 113307, ¶ 97. However, it is not the trial court's task to "redecide the defendant's guilt in deciding whether to grant relief." *Id.* Further, "[t]he new evidence need not be entirely dispositive to be likely to alter the result on retrial." *Robinson*, 2020 IL 123849, ¶ 48. "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior

evidence along with the new evidence." *Id.*; see also *Coleman*, 2013 IL 113307, ¶ 97 (the sufficiency of the State's evidence for conviction beyond reasonable doubt is not the proper inquiry because if it were, the remedy would be acquittal, not a new trial).

¶ 165    We preliminarily observe, as does defendant, that the State does not challenge whether the evidence presented is newly discovered or material. Instead, the State argues that the evidence was not conclusive to warrant the possibility of a different result at retrial.

¶ 166    We further note that the postconviction court did not make explicit findings as to whether defendant had met his burden as to whether the evidence presented was either newly discovered, or material and cumulative. Based on our review of the record, it appears that the postconviction court only took issue with whether the evidence presented was conclusive enough to change the result on retrial. For instance, in its oral ruling, the court commented that defendant had presented "new information" which may have lent support to "some claim that there was coercion by the police" as a basis for the recanting witnesses' original identifications. However, the court did not make express findings as to each affidavit or testifying witness.

¶ 167    We assume, without deciding, that the court found that defendant had met his burden on the "newly discovered" and "materiality" elements of his actual innocence claim. Accordingly, we consider only whether the evidence presented was conclusive enough to change defendant's conviction on retrial, and we express no opinion as to whether defendant met his burden on the other two elements.

¶ 168    *a. Whether the evidence was so conclusive that it would probably change the trial's result*

¶ 169    Defendant contends that the evidence presented was conclusive and would have changed the trial result if given the opportunity for retrial. Defendant characterizes Rivera and Lanzarin's testimony at the hearing as contradictory of their testimony at trial, where both originally testified

that the shooter could be identified, which was further supported by the affidavits put forth by Carranza and Figueroa. As such, defendant concludes, because four of the five witnesses who identified defendant at trial recanted those identifications, he is entitled to a new trial, citing *People v. Coleman* and *People v. Ortiz* as instructive.

¶ 170 The State responds that the evidence was not so conclusive to lead to a different result, citing *People v. Morgan*, 212 Ill. 2d 148 (2004), in support. The State points out that at the original trial, five witnesses, including a defense witness, identified defendant as the shooter in both a lineup and in court. Additionally, one witness, Littleton, did not recant, while Cordova, located outside of the restaurant, identified defendant's car at the scene of the shooting. Finally, the murder weapon was found in defendant's residence. Further, the State points out that the testimony of the recanting witnesses was "impeached" because the postconviction court did not find them credible based on their prior convictions and prior trial testimony.

¶ 171 We begin by noting that defendant's defense at trial was one of alibi, namely that he had been with his family on the day of the shooting. To that end, defendant's common-law wife and aunt testified that he had been with them the night of the shooting. Defendant's wife further testified that the recovered shotgun had been given to defendant by an unidentified individual after the shooting occurred. That testimony was balanced against the eyewitness testimony placing him at the site of the shooting on December 11, 1984.

¶ 172 Here, defendant's evidentiary hearing in third-stage proceedings centered on recanted witness testimony that had previously identified him at the scene of the shooting. As correctly noted by the State, recanted testimony has been "regarded as inherently unreliable." *Morgan*, 212 Ill. 2d at 155. Nevertheless, "recantation statements should not simply be dismissed without further analysis." *People v. Serrano*, 2016 IL App (1st) 133493, ¶ 26. Ultimately, though, absent any

"extraordinary circumstances," a reviewing court will not grant relief for a new trial. *Morgan*, 212 Ill. 2d at 155. Accordingly, we assess the four witnesses who either provided affidavits, in-court testimony, or both as to their purported failures to properly identify the shooter at the scene: (1) Rivera; (2) Lanzarin; (3) Figueroa; and (4) Carranza.

¶ 173    At trial, when called as a defense witness, Rivera testified that, although he had picked out "Sergio" and "Tony" in police lineup books, he had done so because those two individuals had resembled the shooter with regard to build and face. Rivera then viewed two lineups, the first one in which defendant had not been present, and further identified defendant as the shooter in court.

¶ 174    In contrast, in his affidavit, Rivera averred that he picked out two individuals, "Sergio" and "Tony," as those involved in the shooting, but was told later by police that defendant was the shooter. Rivera averred that the police had threatened him, and so he chose defendant in a lineup. Rivera also averred to having a conversation with defendant over the telephone prior to trial, indicating that he would "tell the truth," but once he got on the stand as a defense witness, he became scared and lied. During the evidentiary hearing, Rivera stated that he had not been able to recognize the shooter because he had been wearing a ski mask, but that he had been shown "books" of other gang members where he identified "Tony" and "Sergio." He also testified that the police had shown him the shotgun and an identification picture of defendant, and that although he identified him in the lineup, he did so only after police told him to do so. Rivera also testified that he had attempted to contact defendant for multiple years to sign an affidavit on his behalf, which defendant apparently refused for many years.

¶ 175    At trial, Lanzarin testified that he had been about 20 feet away from the door of the restaurant and that the entire incident had lasted about 30 seconds. He identified the shooter in a much more detailed fashion, in that he had been dressed in black, with a ski hat on his head, black

- 48 -

gloves, and a gray scarf. Lanzarin testified that he had been able to observe the shooter throughout the entire incident, even after he retreated behind the video games. He had been able to see the shooter's nose, eyes, mouth, and mustache, that he was 18 to 20 years old, and was "chubby." Further, he had testified that one of the shooter's eyes was "hanging low," a similar observation made by Littleton, a non-recanting witness. Finally, Lanzarin was also able to identify defendant in a lineup and in court.

¶ 176   Now, in his affidavit, Lanzarin averred that the shooter had been wearing a "bandanna" that came down to his eyes, which were the only discernible features. Lanzarin stated he could not identify the shooter but was also threatened by police and succumbed because he had been "young and scared." At the hearing, Lanzarin testified that the shooting had happened quickly, that he could only see the shooter's eyes, and that he had been wearing a "bandanna" that covered his eyes, but also his head and ears. Lanzarin also testified that police threatened him to identify defendant in a lineup or else they would frame him for drug possession, which he admitted to discussing with his friends prior to signing an affidavit.

¶ 177   Defendant also proffered affidavits of Carranza, Figueroa, and Maldonado, which, pursuant to the Act and at the time of hearing, became valid forms of evidence to be considered in postconviction claims. See 725 ILCS 5/122-6 (West 2008); see also Ill. R. Evid. 1101(b)(3) (eff. Sept. 17, 2019) (traditional rules of evidence limiting or prohibiting hearsay rules are not applicable in postconviction proceedings); see also *Morgan*, 212 Ill. 2d at 162 ("The [postconviction] court has wide discretion to limit the type of evidence it will admit at a postconviction hearing.").

¶ 178   At trial, Figueroa testified that, on the night of the shooting, the restaurant was brightly lit, and he was able to see the front door of the hot dog stand given his position 15 or 20 feet away.

His description of the shooter was also highly detailed and corroborated Lanzarin's original description of the shooter, in that he was wearing a black jacket, a black ski hat that came down slightly above his eyebrows, and a gray scarf. Figueroa further testified that he could see the shooter's eyes, lips, mouth, cheeks, and a black mustache. He believed the shooter to be a Hispanic male, about 19 or 20 years old, about five foot six to seven inches. Figueroa also testified that he had been able to watch both the shooter's face and the gun, and was able to identify defendant in a lineup, in a photo array, and in court as the shooter.

¶ 179   In contrast, in his affidavit, Figueroa averred that he had told police that he did not know who shot him because the shooter had been wearing a ski mask. Figueroa did not comment on the remainder of the shooter's description and stated that he had also been coerced by both police and the state's attorney to identify defendant as the shooter. Notably, Figueroa did not testify at the hearing, and thus could not be cross-examined on these claims.

¶ 180   As to Carranza, our understanding of his trial testimony is limited, given that, as noted prior, a portion of the record is missing. At trial, Carranza testified that he was able to see the restaurant doors and saw a person standing there with a gun. He stated that the shooter was wearing a black hat with a scarf that covered his ears, but he had been able to see other parts of his face. He also later identified defendant in a lineup and photo array.

¶ 181   In his affidavit, Carranza averred that he was unable to identify the shooter because his face and head had been covered, but that the police told him who to pick out and that he did was they told him. Although Carranza did not testify at the hearing, the State's investigators conducted an independent interview of him, and reported that Carranza confirmed the veracity of his affidavit.

¶ 182   Finally, the petition contained two separate affidavits from Maldonado. The first one, dated in 2008, attested that he had bought a shotgun from an individual to commit an armed robbery.

The police found him at some point and asked him about a shooting at a restaurant. Maldonado averred that after police began to threaten and "beat him up," he told them that he had sold a shotgun to someone named "Popeye," defendant's street name, who he had just met after committing a home invasion. He averred that the police then arrested defendant, and coerced Maldonado to lie and say that defendant had been the shooter. His subsequent affidavit further reiterated that Maldonado had sold a shotgun to defendant, but that Maldonado was actually the one who killed Martinez, and that he had previously given a false statement as he was worried about the death penalty and thought he would have been given a break from a separate conviction.

¶ 183   The postconviction court ultimately determined that Rivera and Lanzarin were not credible. Although the postconviction court did not address any of the affidavits filed in support of the petition, it questioned whether it could attribute weight to certain affidavits, other than acknowledging that they had been filed.

¶ 184   We are mindful of our limited role in assessing the ultimate determination of the postconviction court when there are considerations of witness credibility, the weight of given testimony and evidence, and the resolution of evidentiary conflicts. See *Domagala*, 2013 IL 113688, ¶ 34. It is not entirely clear which affidavits were discussed with the postconviction court following the close of testimony. Nevertheless, we may only reverse the postconviction court's ultimate dismissal of the petition if we find there to be a clearly evident, plain, or indisputable error. *Coleman*, 2013 IL 113307, ¶ 98.

¶ 185   On balance, we are unable to find a *clearly evident* error, although admittedly, it can be fairly said that the evidence presented raises some questions. On the one hand, the conclusion to be drawn from the underlying trial record is that defendant was only identified in connection with the shooting after the police detained Maldonado, his co-defendant, who in a sworn affidavit now

claims that he was the shooter and sold the gun to defendant thereafter. This affidavit comports with defendant's common-law wife's testimony that defendant received a shotgun at their residence, which was part of his alibi defense at trial. Further, none of the testifying officers indicated in any of their reports or in their statements that the initial suspect had a distinguishing facial feature, such as a "crooked" or lower-set eye, one of the otherwise defining features identified by the witnesses.

¶ 186 We also find it interesting that Rivera, although called on behalf of the defense in the underlying trial, ultimately ended up identifying defendant as the shooter on the stand. Now, Rivera's affidavit and testimony at the hearing was that he planned to testify on behalf of defendant "to tell the truth," but ultimately, he did not due to his fear of the police. Whether true or not, this certainly helps explain defendant's trial counsel's seemingly odd trial strategy in placing him on the stand.

¶ 187 Nevertheless, the other recanting witnesses provide less credit to defendant's theory of actual innocence. For example, in his trial testimony, Lanzarin testified that he was able to see most of the shooter's face as well as his clothing, and that the shooter had a distinguishing eye feature. In the evidentiary hearing, Lanzarin testified that he could still see the shooter's eyes, but he did not recant his testimony regarding whether the eye was crooked or lower set. This is significant, given that the State's other eyewitness, Littleton, did not recant his testimony, which was also very detailed and also contained the description of the shooter's eye. See *Harris*, 2018 IL 121932, ¶ 27 (on direct criminal appeal, observing that our supreme court has consistently held that the testimony of a single eyewitness, if possible and credible, is sufficient to support a conviction).

¶ 188   Although defendant retorts that Littleton's failure to recant is of no import, citing *People v. Ortiz* in support, we disagree, as *Ortiz* is distinguishable. In *Ortiz*, the petitioner was convicted of first-degree murder after a bench trial, which was affirmed on appeal. 235 Ill. 2d at 322. The State presented two eyewitnesses, both of whom had originally given statements to police that they had seen the petitioner fire a gun at the victim. *Id.* at 323-324. Both witnesses later attempted to recant their statements while on the stand, with one alleging police brutality and coercion. *Id.* at 323. The trial court characterized their recantations as having "little weight for believability," and found corroboration between the witness's prior statements and the forensic and ballistic reports entered into evidence. *Id.* at 324.

¶ 189   The petitioner filed a successive postconviction petition alleging actual innocence based on newly discovered eyewitness testimony. *Id.* Petitioner presented affidavits of two individuals who claimed that petitioner had never been present at the scene of the murder. *Id.* at 326. At a third-stage evidentiary hearing, one witness testified that he had seen other individuals attack and murder the victim, and that petitioner had never been present at the scene. *Id.* at 327. He indicated that he had never reported this story to police because he had been afraid of subsequent retaliation. *Id.* Following the close of testimony, the postconviction court denied the petitioner's request for a new trial. *Id.* at 322.

¶ 190   On appeal, our appellate court found that the petitioner was entitled to a new trial based on the newly discovered evidence. *Id.* at 328. Our supreme court affirmed. *Id.* at 337. As to whether the evidence was conclusive to change the result at retrial, the court found that it did, finding that the new testifying witness directly contradicted the recanted statements of the two prosecution witnesses. *Id.* at 336-37. The court further observed that there had been no physical evidence

linking the petitioner to the crime, and thus, evidence of the petitioner's innocence was stronger when weighed with the recanted statements of the State's eyewitnesses in the underlying trial. *Id.*

¶ 191 We do not have the same circumstances here. *Ortiz* hinged on the importance of previous statements made to police that were ultimately recanted *on the stand* at trial, and how those statements ultimately aligned with the emergence of newly discovered eyewitness testimony during the petitioner's postconviction hearing. Here, the recanting witnesses all provided consistent and detailed descriptions of the shooter, as well as lineup and in court identifications of defendant at trial. Additionally, Littleton's detailed testimony regarding the shooter, which, like Lanzarin's testimony, included the description of the facial feature of a lower-set eye, has not been recanted. Finally, *Ortiz* further highlighted the fact that there had been no *physical evidence* linking the petitioner to the murder, whereas here, the shotgun used in the murder had been discovered in defendant's residence. See also *Morgan*, 212 Ill. 2d at 163 (petitioner failed to meet his burden on actual innocence claim where other remaining eyewitness testimony was not recanted, in conjunction with other non-credible evidence). Although we acknowledge that Maldonado's affidavits averred that he had sold the shotgun to defendant following the shooting, it does not escape our notice that Maldonado, the now professed murderer, did not testify at the hearing and the court was not able to assess his credibility. It is also worth noting that Maldonado filed two affidavits that shifted his recounting of the shooting multiple times.

¶ 192 As to Vazquez's testimony and accompanying documentation, which we will discuss in further detail regarding the ineffective assistance of counsel claim, we also agree with the State that her testimony would not have changed the result at trial. Vazquez's testimony did nothing to bolster defendant's alibi defense. She was not a witness to the shooting, and her testimony went to that of defendant's co-defendant, Maldonado, who was tried and convicted for the shooting in a

severed trial. Moreover, the postconviction court did not find her credible. Finally, the-remaining affidavits, such as the one proffered by defendant's brother, were from individuals who were not eyewitnesses, and thus added nothing to defendant's alibi defense that had not already been placed at issue in the underlying trial.

¶ 193   On balance, when weighing the evidence presented at trial against the evidence presented during the third stage evidentiary hearing, and in deference to the postconviction court's credibility and evidentiary determinations, we find that the court properly determined that defendant failed to meet his burden in presenting conclusive evidence likely to change the result on retrial. Based on the facts before us, we do not find that there was another clearly evident, plain, or indisputable conclusion. Accordingly, his actual innocence claim must fail.

¶ 194   We note in passing that when discussing Vazquez's testimony, the court asked rhetorically, "Does [her statement] exonerate the co-defendant because whatever Ms. Vazquez claims that she heard from one person who was convicted, that meant the other person who was convicted should have been convicted of something? These are separate trials." To be clear, to the extent that the court's comment may be read as relating to sufficiency of the evidence, we note that a similar line of reasoning was rejected in *Robinson*. See 2020 IL 123849, ¶¶ 55-56 (discussing the rejection of the "total vindication or exoneration standard" in actual innocence claims). In any case, based upon our review, defendant has failed to sustain his burden to support a claim of actual innocence.

¶ 195                                    2. Ineffective Assistance of Trial Counsel

¶ 196   Defendant argues that his trial counsel was deficient for failing to investigate and present the testimony of Vazquez, who averred that she witnessed Maldonado confess to the shooting shortly after it occurred. The State responds that defendant's ineffective assistance claim also fails because defendant cannot establish prejudice, as there was no reasonable probability that the result

of the trial would have been different if Vazquez had testified based on the other evidence against him.

¶ 197   Claims regarding ineffective assistance of counsel are reviewed as mixed questions of law and fact. *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 137. We defer to the court's factual findings unless they are against the manifest weight of the evidence, but review the ultimate determination of whether counsel rendered ineffective assistance *de novo. Id. De novo* review means we perform the same analysis as the postconviction judge. *People v. Jackson*, 2021 IL App (1st) 190263, ¶ 38. As we owe no deference to the postconviction court's reasoning, we may affirm on any basis found in the record. *Id.*

¶ 198   Claims of ineffective assistance are governed by the familiar two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *Velasco*, 2018 IL App (1st) 161683, ¶ 138. Pursuant to *Strickland*, a defendant must first show that his counsel's performance fell below an objective standard of reasonableness. *Id.* Second, the defendant must establish prejudice by showing that there is a reasonable probability that the result of the proceeding would have been different but for his counsel's deficient performance. *Id.* A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome," where a postconviction petitioner has the burden of demonstrating that, absent counsel's errors, the "factfinder would have had a reasonable doubt respecting guilt." *People v. Morris*, 335 Ill. App. 3d 70, 78 (2002) (quoting *Strickland*, 466 U.S. at 694. (Internal quotation marks omitted).

¶ 199   In determining whether the assistance received by a defendant was ineffective, a court considers "whether counsel's assistance was reasonable considering all the circumstances." *Id.* The defendant's burden must overcome the strong presumption that his lawyer's conduct was sound trial strategy and falls within a wide range of reasonable professional assistance. *Id.*

Moreover, a defendant is not entitled to *perfect* representation, only competent. *Id.* "Competence" is ascertained not from isolated incidents, but from a consideration of the totality of counsel's conduct. *Id.* However, a postconviction petitioner may overcome this strong presumption "if counsel's decision appears so irrational and unreasonable that no reasonably effective attorney, facing similar circumstances, would pursue such a strategy." *People v. King*, 316 Ill. App. 3d 901, 916 (2000); see also *People v. Moore*, 279 Ill. App. 3d 152, 159 (1996) ("sound trial strategy *** embraces the use of established rules of evidence and procedure to avoid, when possible the admission of incriminating statements, harmful opinions, and prejudicial facts.").

¶ 200   Defendant argues that his trial counsel's alleged failure to investigate Vazquez's statement made to police, which was apparently contained within the discovery tendered to counsel during the original trial proceedings, was detrimental to his alibi defense, citing *People v. Truly*, 230 Ill. App. 3d 948 (1992), as instructive. Defendant asserts that her testimony aligned with other witness testimony regarding the description of the shooter's clothing, and her description of her interaction with Maldonado may have been enough to exonerate him.

¶ 201   The State does not appear to contest defendant's claim that his trial counsel's assistance fell below an objective standard of reasonableness. Instead, the State argues that defendant cannot establish prejudice for his trial counsel's decision to not call Vazquez, in that there was no reasonable probability that the trial result would have been different if she had been called as a witness, citing *People v. English*, 403 Ill. App. 3d 121 (2010), in support. Moreover, the State points out, Maldonado had already been convicted in a separate trial for the same crime, and as Vasquez was not a witness to the shooting, her statement does nothing to relieve defendant of his involvement.

¶ 202   We begin by noting that, curiously, defendant admits in his brief that Vazquez's statement was always "available in discovery, admissible and helpful to the defense." The State makes no argument as to whether defendant's ineffective assistance claim on this basis was waived, given that he has previously filed various postconviction petitions alleging ineffective assistance of trial counsel. It is well-established that the doctrines of *res judicata* and waiver limit postconviction relief to constitutional claims that have not been and could not have been raised earlier. *English*, 403 Ill. App. 3d at 130. This includes issues that *could have* been raised in earlier proceedings but were not. *Id.*; see also 725 ILCS 5/122-3 (West 2008). The record reflects that defendant's previous petitions alleged ineffective assistance of counsel claims, including his counsel's purported error in calling Rivera as a defense witness, which was dismissed in *Hoddenbach II.*

¶ 203   Waiver aside, we agree with the State that defendant has failed to meet his burden on his *Strickland* claim, specifically as to the second prong. Even so, although we need not do so, we elect to address defendant's claim that counsel's conduct fell below the level of reasonableness.

¶ 204   The record reflects that defendant's trial counsel stipulated at the evidentiary hearing that he had reviewed all of the discovery tendered to the State, including police reports, and he did not recall Vazquez or ever having interviewed her. Current counsel for defendant affirmatively states now that this statement *was* made available in discovery, and Vazquez testified during the hearing that she was never contacted by either the police or any attorney after she gave her statement.

¶ 205   "Trial counsel has a professional duty to conduct 'reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *Domagala*, 2013 IL 113688, ¶ 38 (quoting *Strickland*, 466 U.S. at 691)); see also *Morris*, 335 Ill. App. 3d at 79 (defense counsel has professional obligation, both legal and ethical, to explore and investigate). This duty is derived from counsel's most basic function, "to make the adversarial testing process work in the

particular case." *Id.* (Internal quotations omitted). Such a duty "includes the obligation to independently investigate any possible defenses." *Domagala*, 2013 IL 113688, ¶ 38. Thus, "lack of investigation is to be judged against a standard of reasonableness given all of the circumstances, applying a heavy measure of deference to counsel's judgment." *Id.* (Internal quotations omitted).

¶ 206   Trial counsel's decision "whether to present a particular witness is within the realm of strategic choices that are generally not subject to attack on the grounds of ineffective assistance of counsel." *King*, 316 Ill. App. 3d at 913. However, failure to investigate or present available witnesses to corroborate a defense has been found to be ineffective assistance. See *People v. Garza*, 180 Ill. App. 3d 263, 269 (1989) (where defense counsel could have presented physical evidence or witness testimony during trial, but failed to obtain and only attempted to present such issues on post-trial motion, failure to adequately investigate may be ineffective assistance); *People v. Solomon*, 158 Ill. App. 3d 432, 436-437 (1987) (defense counsel's conduct failed *Strickland* test because counsel had been unable to corroborate client's testimony and defense by failing to locate and compel corroborating witness); *People v. Tate*, 305 Ill. App. 3d 607, 612 (1999) (counsel may be deemed ineffective for failure to present exculpatory evidence of which he is aware); *King*, 316 Ill. App. 3d at 913 (2000) (collecting cases)).

¶ 207   We agree with defendant that trial counsel's purported failure to interview or investigate Vazquez's statement fell below the level of reasonableness. We agree that it would have been reasonable to at least interview Vazquez, considering Maldonado's alleged confession to her, his clothing's similarity to that of the alleged shooter, and that he may have been carrying a shogun. Further, counsel would have been aware of the statement given to police if it was included in discovery, and there is no indication that it had not been tendered to him.

¶ 208    However, defendant did not establish prejudice by showing that there was a reasonable probability that the trial would have produced a different result but for his trial counsel's failure to investigate Vazquez. See *English*, 403 Ill. App. 3d at 137 ("Whether defense counsel was ineffective for failure to investigate is determined by the *value* of the evidence that was not presented at trial[,] and the closeness of the evidence that was presented."). (Emphasis added). We do not find Vazquez's statement to be exculpatory, given that she did not witness the shooting and only encountered Maldonado, who was implicated on his own when tried by a separate jury. Her statement and testimony would not have added anything of value to defendant's alibi defense, and did not contradict the other witnesses at trial, who positively identified defendant in a lineup and at trial. Further, we are also mindful that the postconviction court did not find her credible or her testimony compelling.

¶ 209    Accordingly, we do not find that defendant met his burden on the second prong of the *Strickland* test, and therefore cannot meet his burden overall on his ineffective assistance of trial counsel claim. As such, we also affirm the postconviction court on this basis.

¶ 210                                   D. State's Request for Fees

¶ 211    Finally, the State requests that this court grant costs and fees for defending the appeal in *Hoddenbach III*, citing 725 ILCS 5/110-7(h), 55 ILCS 5/4-2002.1, and *People v. Nicholls*, 71 Ill. 2d 166 (1978), in support. Defendant does not challenge this request.

¶ 212    725 ILCS 5/110-7(h) (West 2010) governs procedures of payment and fees for bailable offenses. Section 110-7(h) provides that, following a judgment for a fine or court costs or either, in which a deposit for a bail bond has been made, such a deposit may be applied to the payment of

the ultimate judgment. *Id.*[19] The State's other cited statute, 55 ILCS 5/4-2002.1, has since been repealed, effective July 1, 2019. However, the 2010 version of the statute provided that the State's Attorney for a specific county may collect a fee of $100 for any costs of an appeal taken from the requisite county. 55 ILCs 5/4-2002.1 (West 2008). Here, although *Hoddenach III* concluded well after the statute's repeal, the notice of appeal filed in *Hoddenbach III* was filed before July 1, 2019. Accordingly, we grant the State's request for costs and fees. See *Nicholls*, 71 Ill. 2d at 179.

¶ 213                                    III. CONCLUSION

¶ 214   For the reasons stated, we affirm the judgment of the circuit court.

¶ 215   Affirmed.

---

[19] Although the statute has been amended since the filing of the appeal in *Hoddenbach*, the relevant portion of the statute has not changed.